MICHAEL W. RICHTER *v.* DANBURY
HOSPITAL ET AL.
(AC 19090)

Hennessy, Zarella and Peters, Js.

Argued May 3—officially released October 3, 2000

---

*Thomas M. Cassone*, with whom, on the brief, was *Lawrence M. Lapine*, for the appellant (plaintiff).

*Michael N. LaVelle*, for the appellee (named defendant).

*Opinion*

ZARELLA, J. The plaintiff, Michael W. Richter, appeals from the judgment of the trial court rendered following the granting of the motion for summary judgment filed by the defendant Danbury Hospital (hospital).[1] On appeal, the plaintiff claims that the court, in granting the motion as to the fifth and seventh counts of the fifth amended complaint, improperly concluded that a genuine issue of material fact does not exist. We reverse in part the judgment of the trial court.

The record reveals the following undisputed facts. The defendant William B. Goldstein has maintained a contractual relationship with the hospital since 1968. Under the terms of the contract, Goldstein agreed to become the chief of radiological services and the director of the radiological department of the hospital. The

---

[1] In addition to the hospital, the defendants are William B. Goldstein and Danbury Radiological Associates, P.C. (Radiological Associates). Goldstein and Radiological Associates filed motions for summary judgment as to the counts in the plaintiff's fifth amended complaint that were directed to them. The court granted in part the motions for summary judgment. Thus, there still are pending counts in the trial court with respect to Goldstein and Radiological Associates. The hospital is, therefore, the only defendant to this action on appeal.

contract charged Goldstein with the responsibility for the selection of all department of radiology personnel, including medical, technical, secretarial and nontechnical personnel. It provided that the technical, nontechnical and secretarial personnel would be employees of the hospital. The contract stated that Goldstein and his associates "shall be and at all times are acting and performing as independent contractors as physicians practicing their profession of medicine and specializing in radiological diagnosis and treatment." Further, the contract provides that Goldstein "may enter into a separate contract with each of your associate radiologists and may pay them directly. In each case you will fully inform the Administrator of the arrangements that you have made with each associate."[2] The contract also provided that Goldstein operate the department in accordance with the ethical and professional standards of the American Medical Association and the American College of Radiology. There was no specific provision in the contract indicating that the contract was exclusive.

The plaintiff is a duly licensed physician and a board certified radiologist. In May, 1973, Goldstein, on behalf of the defendant Danbury Radiological Associates, P.C. (Radiological Associates), entered into an employment contract with the plaintiff. In conjunction with and as a requirement of his employment with Radiological Associates, the plaintiff applied to the hospital for appointment to its medical staff and for privileges.

After completing the application process, the plaintiff was appointed to the medical staff and granted "in-

---

[2] This contract was between Goldstein and the hospital, and there was no evidence that it has ever been assigned by Goldstein to any other entity. At some later time, Goldstein formed Danbury Radiological Associates, P.C., which was the vehicle by which he retained associates to work at the hospital.

house" privileges[3] at the hospital. As part of the application process, the plaintiff acknowledged that he had "received and read the Medical Staff and Hospital

[3] Article III, § (B), of the hospital bylaws states in relevant part: "1. The applicant has the burden of producing adequate information for proper evaluation of his professional competence, character, ethics, and other qualifications; and for resolution of any doubts about such qualifications. An incomplete application will not be processed.

"2. Departmental Action. . . . The completed application will be sent to the Department in which privileges are being sought. After the applicant has been interviewed, the Department will make a recommendation to the Executive Committee within a reasonable time supported by reference to the application and other documentation. The recommendation will be to:

"a. Accept the applicant for membership stating: the category of privileges, the delineation of clinical privileges, whether admitting privileges are recommended, *and other conditions, if any*;

"b. Reject the applicant for membership; or

"c. Defer action on the application, for no more than thirty days.

"3. Executive Committee Action. . . . the Executive Committee may:

"a. Recommend Appointment stating the category of privileges, delineation of clinical privileges, status of admitting privileges, *and any other conditions*;

"b. Make an adverse recommendation in which case the practitioner will be entitled to the due process rights provided for in APPENDIX I, THE FAIR HEARING PLAN. The reason for an unfavorable recommendation will be written and supported by reference to the information the Committee considered; or,

"c. Defer action for a period of up to thirty days at which time the Executive Committee must make either a favorable or an adverse recommendation.

"4. Board of Directors' Action. At the next Board meeting after the Executive Committee action, the Board, after consideration of the Executive Committee recommendation and all other information will:

"a. Accept the applicant for membership, stating the category of privileges, delineation of clinical privileges, status of admitting privileges, *and special conditions*, if any;

"b. Reject the applicant, in which case the applicant shall be entitled to the procedural rights in APPENDIX I, THE FAIR HEARING PLAN; or,

"c. Refer the application back to the Executive Committee for a period of up to thirty days, for reconsideration stating the reasons therefore [sic].

"d. If there is an adverse recommendation by the Executive Committee or a rejection by the Board, final Board action will be taken only after the applicant has waived or exhausted his procedural rights provided for in the Bylaws.

"e. When the Board's proposed decision is contrary to the recommendation of the Executive Committee, the Board will submit the matter to the Medical

Bylaws, and Rules and Regulations, and agreed to be bound by them if granted membership."

On July 9, 1991, the board of directors of Radiological Associates voted to terminate the plaintiff's employment with Radiological Associates "without cause." It is undisputed that the plaintiff's termination was not on the basis of professional competence. In accordance with the terms of his contract with Radiological Associates, the plaintiff was given a ninety day notice of termination. The plaintiff sought a meeting with the president of the hospital, Gerard D. Robilotti, and was advised that because Robilotti construed the hospital's contract with Goldstein to be exclusive, the hospital would be unable to develop a separate relationship with the plaintiff.

On August 9, 1991, the plaintiff, through his counsel, advised the hospital that the impairment of his privileges without a hearing was a violation of the hospital's bylaws. No response was forthcoming. On August 21, 1991, Goldstein ordered the plaintiff to leave the hospital and told him not to return. This was within the ninety day notice of termination period under the Radiological Associates employment contract.

On September 3, 1992, the plaintiff submitted his biennial request for "in-house" privileges to the hospital. This was the same category of privileges that he had maintained for the previous eighteen years when he was employed by Radiological Associates. Goldstein, as chairman of the department of radiology, recommended to the executive committee that the plaintiff be granted "private office" privileges.[4] The executive

Affairs Committee, for a recommendation, as provided for in THE FAIR HEARING PLAN, before the Board renders its final decision." (Emphasis added.)

[4] "Private office" privileges are not nearly as extensive as the "clinical" privileges the plaintiff maintained for eighteen years.

committee approved the recommendation on October 20, 1992. The executive committee's recommendation was forwarded to the hospital's board of directors, which failed to take any action.

An action was commenced by the plaintiff in eight counts. Counts four, five and seven are directed against the hospital.[5] Count four alleges that the hospital engaged in unfair and deceptive practices in violation of the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq. Count five alleges that the hospital breached its contract with the plaintiff by not allowing him to exercise the privileges granted to him to use the facilities and equipment. Count seven alleges that the hospital breached its contract with the plaintiff when it failed to grant him a hearing on his termination or reduction in privileges as provided for under the fair hearing plan provisions of the bylaws. The hospital filed a motion for summary judgment, which was opposed by the plaintiff. After oral argument, the court in a written memorandum of decision granted the hospital's motion as to counts four, five and seven. The plaintiff claims that the court improperly granted the motion with respect to counts five and seven because issues of material fact exist.

"The standard of review of a trial court's decision to grant summary judgment is well established. [W]e must decide whether the trial court erred in determining that there was no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." (Internal quotation marks omitted.) *Sherwood* v. *Danbury Hospital*, 252 Conn. 193, 201, 746 A.2d 730 (2000). "In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The test is

[5] On appeal, the plaintiff does not challenge the granting of summary judgment as to count four.

whether a party would be entitled to a directed verdict on the same facts. . . . *Serrano* v. *Burns*, 248 Conn. 419, 424, 727 A.2d 1276 (1999)." (Internal quotation marks omitted.) *Hoskins* v. *Titan Value Equities Group, Inc.*, 252 Conn. 789, 792, 749 A.2d 1144 (2000).

On appeal, the scope of our review of the granting of a motion for summary judgment is plenary. *Doucette* v. *Pomes*, 247 Conn. 442, 453, 724 A.2d 481 (1999). "In seeking summary judgment, it is the movant who has the burden of showing the nonexistence of any issue of fact." *D.H.R. Construction Co.* v. *Donnelly*, 180 Conn. 430, 434, 429 A.2d 908 (1980). "Although the party seeking summary judgment has the burden of showing the nonexistence of any material fact . . . a party opposing summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact together with the evidence disclosing the existence of such an issue. . . ." (Internal quotation marks omitted.) *Home Ins. Co.* v. *Aetna Life & Casualty Co.*, 235 Conn. 185, 202, 663 A.2d 1001 (1995).

We conclude that the hospital has failed to sustain its burden of demonstrating that there are no material facts in dispute and that it is entitled to judgment as a matter of law. We begin by reviewing the bylaws of the hospital in light of the claims made by the parties. In count five of the fifth amended complaint, the plaintiff claims that he entered into a contractual arrangement with the hospital whereby he agreed to abide by the bylaws and rules and regulations of the hospital, and that the hospital agreed to allow the plaintiff the use of the hospital facilities.[6] He further alleges that he

---

[6] Count five of the fifth amended complaint states in relevant part: "16. The Defendant Hospital, by granting the Plaintiff staff and clinical privileges, entered into an agreement with the Plaintiff whereby the Plaintiff agreed to abide by the Hospital's rules and regulations, and the Defendant Hospital agreed to allow the Plaintiff the use of its Hospital facilities, including, inter alia, its facilities and admission privileges.

"17. The Defendant Hospital, by refusing to allow the Plaintiff the use

was denied access to those facilities in breach of the agreement. The plaintiff alleges in count seven that the hospital breached the agreement when it failed to afford him a hearing under the fair hearing plan. The hospital counters by claiming that the granting of privileges does not create a contract between the hospital and the plaintiff and, therefore, absent a contract there can be no breach.[7] Further, the hospital argues that if a contract exists, then its terms are conditioned on the plaintiff's continued employment by Radiological Associates.

In *Gianetti* v. *Norwalk Hospital*, 211 Conn. 51, 52, 557 A.2d 1249 (1989), the plaintiff physician brought an action against Norwalk Hospital, alleging breach of contract and antitrust violations. The action arose out of the alleged illegal refusal of the defendants to reappoint the plaintiff to the medical staff of the hospital. Id. The Supreme Court found that the bylaws, in and of themselves, did not constitute an enforceable contract. Id., 59. The court further stated: "An examination of the hospital's medical staff bylaws discloses that the hospital clearly intended that membership on its medical staff was a 'privilege' that it might or might not extend to a physician. It can hardly be said that the

and enjoyment of the Hospital facilities, has breached its contract with the Plaintiff."

[7] In its memorandum of decision, the court stated in part that "[i]n the present case, it is clear the Danbury Hospital bylaws constitute a part of the contract between the hospital and [the plaintiff], and neither party argues otherwise. See *Gianetti* v. *Norwalk Hospital*, 211 Conn. 51 [557 A.2d 1249 (1989)]." While it may be true, as the court noted, that neither party argued that no contract existed between the plaintiff and the hospital, the hospital on appeal argues that the granting of privileges does not amount to a contract. The hospital argues in its brief that "[h]aving never had a contract with Danbury Hospital, [the plaintiff's] entire case depends upon his assumption of a material fact which does not appear as evidence; namely, that the term 'privileges' when used in any hospital's bylaws becomes a legal term of art which 'necessarily' imposes a right of access and use of hospital departments for physicians." It appears, therefore, that the hospital does not concede that a contract exists with the plaintiff.

hospital must extend the privileges to every physician who seeks them. Once this hospital, however, has agreed to extend privileges to a physician, the hospital has changed its position with reference to that physician. By agreeing to extend privileges to the plaintiff physician, the hospital has then done something it was not already bound to do. . . . In granting privileges, this hospital extended to the plaintiff those benefits to his medical practice that are to be gained by the use of the hospital, including its facilities and admissions to the hospital." (Citations omitted.) Id., 62–63.

In *Gianetti*, the Supreme Court further stated: "Whatever else the granting of staff privileges may connote, it is clear . . . that it [at least] involves a delegation by the hospital [to the physician] of authority to make decisions on utilizations of its facilities. . . . In return for that, the plaintiff agreed to abide by its medical staff bylaws. Therefore, the requisite contractual mutuality was then present. . . . This agreement was supported by valid consideration. . . . The hospital changed its position by granting medical staff privileges and the plaintiff physician has likewise changed his position in doing something he was not previously bound to do, i.e., to abide by the hospital medical staff bylaws. Therefore, there is a contractual relationship between the hospital and the plaintiff." (Citations omitted; internal quotation marks omitted.) Id., 63.

"The existence of a contract is a question of fact to be determined by the trier on the basis of all the evidence. . . . To form a valid and binding contract in Connecticut, there must be a mutual understanding of the terms that are definite and certain between the parties. . . . To constitute an offer and acceptance sufficient to create an enforceable contract, each must be found to have been based on an identical understanding by the parties." (Citations omitted; internal quotation marks omitted.) *L & R Realty* v. *Connecticut National*

*Bank*, 53 Conn. App. 524, 534, 732 A.2d 181, cert. denied, 250 Conn. 901, 734 A.2d 984 (1999).

In this case, the hospital denies the existence of any contract. It claims that the plaintiff's contract is with Radiological Associates. The plaintiff claims, however, that he has a contract with Radiological Associates and with the hospital. In offering the hospital bylaws and his application for privileges, the plaintiff adequately has demonstrated that there is a genuine issue of material fact as to whether a contract exists between him and the hospital.

The hospital further argues that it is entitled to summary judgment even if a contractual relationship exists because it could not, as a matter of law, grant access to the facility and equipment due to the alleged exclusive nature of its relationship with Goldstein.[8] Further, the hospital argues that the plaintiff's right to use its facilities and equipment was conditioned on his continued employment by Radiological Associates.

We also note that whether the contractual arrangement between Goldstein and the hospital is an exclusive arrangement is, under the circumstances of this case, a factual issue. The hospital offers, in support of its claim of exclusivity, the 1968 contract between Goldstein and the hospital as well as the affidavit of the president of the hospital. The plaintiff offers in opposition to this claim the 1968 contract, his observations of the actual practices employed by the hospital and the American College of Radiology policy on exclusive contracts.

---

[8] We also note that we are not deciding by implication whether an exclusive contract between Goldstein and the hospital would provide the hospital with a valid defense to the breach of contract claim brought by the plaintiff. Rather, our decision is limited to determining that the issue of exclusivity in this case is one of fact and, therefore, on that basis, summary judgment is not appropriate.

"Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact; *Gurliacci* v. *Mayer*, 218 Conn. 531, 567, 590 A.2d 914 (1991); *Finley* v. *Aetna Life & Casualty Co.*, 202 Conn. 190, 199, 520 A.2d 208 (1987); [w]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law. *Thompson & Peck, Inc.* v. *Harbor Marine Contracting Corp.*, 203 Conn. 123, 131, 523 A.2d 1266 (1987). . . . *Mulligan* v. *Rioux*, 229 Conn. 716, 740, 643 A.2d 1226 (1994)." *Bank of Boston Connecticut* v. *Scott Real Estate, Inc.*, 40 Conn. App. 616, 621, 673 A.2d 558, cert. denied, 237 Conn. 912, 675 A.2d 884 (1996).

The contract between Goldstein and the hospital contains no definitive language indicating an exclusive arrangement. Thus, the intent of the parties to the contract is a question of fact in need of determination by the trier of fact. Factors that may enter into the trier's consideration of the intent of the agreement may be the parties' agreement that the department of radiology would be run "in accordance with the ethical and professional standards of the American Medical Association and the American College of Radiology." The plaintiff presented, in opposition to the motion for summary judgment, the American College of Radiology policy on exclusive arrangements between hospitals and individual doctors or groups. The policy appears to prohibit the type of arrangement that the hospital claims the 1968 agreement created. This weighs against the hospital's claim that the agreement is exclusive. Additional facts may include whether others who are not members of Radiological Associates have access to the radiology facilities and equipment. The hospital and the plaintiff disagree over whether other departments or physicians have such access. The plaintiff's affidavit dated October 30, 1996, in opposition to the motions

for summary judgment specifically alleges facts in support of his contention that Goldstein (or Radiological Associates) is not the sole provider of radiology services.[9]

The hospital also argues, in the alternative, that the plaintiff's contract with the hospital was conditioned on his continued association with Radiological Associates. This, however, also is in dispute. The plaintiff claims to have been unaware of any of the terms of the Goldstein contract, including the alleged exclusive nature of the contract. Additionally, the hospital bylaws provide for a mechanism to qualify any privileges granted. See footnote 3. The documents offered, in support of or in opposition to the hospital's motion for summary judgment, do not indicate that the privileges granted the plaintiff had any qualification attached. Thus, whether there was any such understanding is a factual issue.[10]

Furthermore, the plaintiff's affidavit clearly establishes that he was denied use of the facilities and equipment by Goldstein and the hospital after he was notified that Radiological Associates was terminating his employment. The plaintiff has raised an issue of fact

[9] The plaintiff's affidavit in opposition to the motions for summary judgment states in relevant part: "That Danbury Radiological Associates, P.C., is not the sole provider of radiological diagnostic imaging services at the Defendant Danbury Hospital . . .

"That nuclear medicine; cardiac nuclear medicine; cardiac angiography; cardiac ultrasound; peripheral vascular ultrasound; obstetrical ultrasound examinations; endoscopic retrograde cholangio pancreatographs; transbronchial brushings and biopsies; retrograde urography are all forms of diagnostic imaging performed in whole or in part by various Danbury Hospital departments other than the Department of Radiology, and often in a manner different than at many other hospitals, where said services *are* performed by the Department of Radiology." (Emphasis in original.)

[10] The application for privileges form contains a section entitled "Department Chairman Recommendation" and another section entitled "Executive Committee Recommendation." Both sections have a place to recommend either "unconditional reappointment," "conditional reappointment," "temporary reappointment" or "other action."

with respect to whether the denial of the use of the equipment constitutes a breach of contract.[11]

In count seven of the fifth amended complaint, the plaintiff alleges that the hospital breached its contract with him by refusing to grant him a hearing under the fair hearing plan provisions of the hospital bylaws. The court found that because the language of the bylaws regarding the fair hearing plan "clearly and unambiguously requires a hearing only for matters bearing on professional competency and conduct, the hospital was not required to provide [the plaintiff] with a hearing." In granting summary judgment, the court found that there existed no issue of material fact with respect to professional competence and conduct. We disagree that there are no issues of material fact.

The hospital bylaws provide that whenever there is an adverse recommendation, there is a right to a hearing.[12] An adverse action is defined in the bylaws as a recommendation that would adversely affect a practitioner's appointment or privileges at the hospital. The

---

[11] See *Gianetti* v. *Norwalk Hospital*, supra, 211 Conn. 63, in which the Supreme Court stated that "it is inherent in this contractual relationship that the hospital must obey its own bylaws. It is crucial to understand that the medical staff bylaws, per se, do not create a contractual relationship between the hospital and the plaintiff but because of the undertakings of the plaintiff and the hospital and because the hospital has a duty to obey its bylaws, the bylaws have now become 'an enforceable *part* of the contract' between the hospital and this physician to whom it has given privileges at the hospital." (Emphasis in original.)

[12] Article III, § (B), of the hospital bylaws provides in relevant part: "3. At its next regular meeting after receipt of the Departmental recommendations and supporting materials, the Executive Committee may . . . b. Make an adverse recommendation in which case the practitioner will be entitled to the due process rights provided for in APPENDIX I, THE FAIR HEARING PLAN. . . .

"4. Board of Directors Action. At the next Board meeting after the Executive Committee action, the Board, after consideration of the Executive Committee recommendation and all other information, will . . . b. Reject the applicant, in which case the applicant shall be entitled to the procedural rights in APPENDIX I, THE FAIR HEARING PLAN . . . ."

fair hearing plan was incorporated into the bylaws of the hospital as appendix I. The fair hearing plan provides for a hearing whenever "a practitioner's appointment, status, or clinical privileges" are adversely affected.

A subsequent section of the fair hearing plan provides that the hearing provided for in the bylaws is to "resolve, on an intraprofessional basis, matters bearing on professional competence and conduct. . . ." The hospital argues that since there was no dispute about the level of professional competence of the plaintiff, there was no requirement that a hearing be held, as the issues at the hearing are limited to "professional competence."

The plaintiff's affidavit in opposition to the motions for summary judgment, however, claims that he was released by Radiological Associates because of Goldstein's belief that he was not cooperative.[13] Whether the plaintiff's conduct[14] was appropriate is a question of fact. It is a material fact because, if proven, it may amount to "conduct" that entitles the plaintiff to a hearing prior to discharge. We conclude that there are material issues of fact that preclude summary judgment.

The judgment is reversed in part and the case is remanded with direction to deny the hospital's motion for summary judgment as to counts five and seven, and for further proceedings according to law.

In this opinion the other judges concurred.

---

[13] The plaintiff's affidavit states in relevant part: "He [Goldstein] has stated that his reason for firing me had to do with my not sharing beepers or pagers with my colleagues and his belief that I hoarded these beepers when I put two of them on his desk . . . ."

[14] The requirements for reappointment in article III, § 5 (4), of the hospital bylaws state in relevant part: "Recommendations concerning reappointment and delineation of clinical privileges will be based upon the following . . .

"k. Cooperation with, and general attitude toward, other practitioners, Hospital personnel, and the public . . . ."